### THE EUROPEAN.

(Circuit Court of Appeals, Fifth Circuit. February 17, 1903.)

#### No. 1,173.

1. SHIPPING—WHO ARE PASSENGERS—SEAMEN RETURNED UNDER CONTRACT.

Citizens of the United States, who shipped as horsemen on an English ship to care for horses and mules during a voyage from New Orleans to South Africa under a contract that they should be returned free to an American port, subjected themselves to the English law, and during the time of their service were to be considered and treated as British subjects; but their term of service ended at the end of the voyage in South Africa, the passage home being a part of their compensation, and on the voyage

home they were passengers, and their rights as such were governed by the laws of the United States.

2. SAME—CARRIAGE OF PASSENGERS—LIABILITY FOR FURNISHING IMPROPER FOOD.
Act Aug. 2, 1882, 22 Stat. 186 [U. S. Comp. St. 1901, p. 2931], to regulate the carriage of passengers by sea from a foreign port to a port of the United States, provides in section 4 that if any such passengers shall at any time during the voyage be put on short allowance for food and water, except in cases of necessity, the master shall pay each passenger $3 for each and every day of such short allowance. *Held*, that the furnishing to passengers, without necessity, of bad or improper food, which was unfit to eat, was equivalent to putting them on short allowance, and entitled them to recover as damages an amount equal to that fixed by the statute.

Appeal from the District Court of the United States for the Eastern District of Louisiana.

This cause was commenced by filing a libel as follows:

"The libel of Armand Marx, Jerry Stoddard, Adolph Gaitskill, Wellman Bond, Robert Bond, Roy Snodgrass, John Smith, G. Hyde, A. R. Emerick, George Nobles, Sidney Thibodou, M. Hagan, J. W. Wilson, James Scott, all citizens of the United States of America, against the British steamship European, in a cause of damages civil and maritime, alleges as follows:

"First. That on or about May 29, 1901, they embarked as passengers on board said S. S. European, at Durban, South Africa, to be transported as passengers on said S. S. European from Durban to New Orleans, their passage money having been paid to the master of the European by Capt. Bennett, of the S. S. Rippingham Grange, for libelants, in the sum of fifty-five dollars for each libelant.

"Second. That as passengers libelants were informed they would receive and expected to receive decent and proper sleeping quarters and proper food and treatment, but that in truth and in fact they were compelled to sleep in the hold, where horses and mules had formerly been kept—this S. S. European having just discharged a cargo of horses and mules; that their food consisted of hash made of rotten salt meat, soup made of rotten salt meat, oatmeal filled with rat excrement and dirt, putrid and rancid oleomargarine, sour bread, chicory without sugar, except at rare intervals, also tea; that food of this character was given libelants during the entire voyage from Durban to New Orleans, which lasted from May 29th to June 29th, or a period of one month, with the exception of two or three days before the vessel reached New Orleans.

"Third. That there was plenty of good wholesome food aboard said S. S. European, which could have been furnished libelants, but it was not; that good potatoes were furnished libelants for the first day or two out, and then ceased; that three times during the voyage were libelants furnished with fresh meat for dinner; that time and again was the captain's attention called to the condition of the food furnished libelants, but he told them they would have to eat that or none; that libelant Marx, acting for all, exhibited some of the rotten meat to the captain that libelants had to eat, but the captain said they had to eat it; that previous to that libelant Marx had waited on the captain, and complained to the captain about the food, and the captain informed him it would be remedied, but it never was.

"Fourth. That libelants suffered mentally and physically by being compelled to eat this character of food; that they have been weakened and debilitated; and that damages in the sum of $500 should be awarded each and every one of libelants by virtue of the foregoing allegations.

"Fifth. That all and singular the premises are true and correct, and within the admiralty jurisdiction of the United States and of this honorable court.

"Wherefore libelants pray that process in due form of law according to the course of this honorable court in cases of admiralty and maritime jurisdiction may issue against the said S. S. European, her tackle, apparel, and

furniture, and that àll persons claiming any right, title, or interest in the said S. S. European may be cited to appear and to answer upon oath all and singular the matters aforesaid, and that this honorable court will be pleased to decree in favor of libelants' demands in the sum of five hundred dollars for each libelant, and that the said S. S. European may be condemned and sold to satisfy same, together with costs; and libelants pray for general and equitable relief."

The answer of claimants alleges as follows:

"First. That the first article of said libel is not true, but the truth is as follows: That the steamship European is not a passenger ship, but a freighter, and on or about May 29, 1901, she was lying in the port of Durban, South Africa, where she had just discharged a cargo of horses and mules, which she had brought from New Orleans, and that the ship was fitted up entirely for the transportation of this live stock; that there was lying in the said port the steamship Rippingham Grange, with the libelants and a large number of other so-called muleteers or horsemen aboard, she being under contract to return them to some port in the United States or Canada; that the master of said vessel applied to the master of the European, and requested that he consent that the libelants and other muleteers on the Rippingham Grange should be transported back to New Orleans, on which voyage the European was about to proceed; that the master of the European made known to the master of the Rippingham Grange the exàct condition of his steamer, and that the same was well known to the libelants when they came on board of his said vessel.

"Second. That the allegations in the second article contained are not true, but the truth is as follows: That libelants well knew when they came on board of the European exactly what were the conditions of the vessel, what were the quarters in which they would have to sleep, and that they chose in the vessel their own sleeping quarters, and that the quarters occupied by them were as good as it was possible to afford them under the circumstances of the case; that the food furnished to them was the best that was on board of the vessel; that the entire stores of the ship had been taken aboard at Liverpool. on the preceding voyage from Liverpool to New Orleans, and before being allowed to clear the entire stores were deposited on the dock, and were inspected by the inspectors of the board of trade, which, under the English law is the authority charged with such inspections; that they were found good, sound, and sufficient in every respect, and the ship was provisioned under this inspection.

"Third. That the allegations of the third article are true in part and false in part. That true it is that there was plenty of good, wholesome food aboard the steamship European, but it is untrue that same was not furnished to libelants; that the best food in the ship was furnished to them; that it was all edible; that fresh meat was furnished as long as the live stock lasted, and that at Barbadoes additional live stock was taken on board; and respondent specially avers that everything possible was done to furnish good food to the libelants, and that in no respect was the ship at fault.

"Fourth. That the allegations of the fourth article are untrue, and that libelants neither suffered mentally nor physically from the food given them, and they were not weakened thereby, and that no damages whatsoever accrued to them.

"Fifth. That the fifth article of the libel is untrue.

"Sixth. Respondent avers that the said libelants were idle, ill-conditioned, and refused to do work that was offered to them; were captious, and disposed to find fault, grumble, and make trouble; that there was really no cause for complaint outside of the hardships necessarily incident to long subtropical voyages such as that from Durban to New Orleans; that they were furnished with quarters as good as could have been furnished under the circumstances, and quarters of which they knew when they came aboard of the vessel; that the food bought was sound and plentiful, and that the fare furnished them was as good as could have been furnished by a freight vessel on a voyage of that character, all of the circumstances being consid-

ered; and that the complaints of libelants are not such as should appeal to this honorable court.

"Seventh. That all and singular the matters set up in this answer are true."

Much testimony was taken tending to show that the food furnished the libelants on board the steamship European in the voyage from Durban, South Africa, to the port of New Orleans, was bad and improper at times, and for some days, during the voyage. The master of the steamship European testified—and his testimony is uncontradicted—of the circumstances and arrangements under which the libelants were taken on board the steamship European for the voyage from Durban, South Africa, to the port of New Orleans, as follows:

"Q. Now, will you state the circumstances, captain, under which these Rippingham Grange men came on board your ship? A. The captain of the Rippingham Grange met me going on shore in the dock at Durban, and asked me if— He told me he was ordered to Sidney with his ship, and his muleteers had to be sent home, and would I take them back to New Orleans; and I said, 'No,' I would have nothing to do with them. I had enough trouble with my own, and I had heard about the trouble that other ships had. So that evening his agent came to me himself, also the American consul, and put it to me as a personal matter that I should relieve him of the responsibility of these men, getting them back to New Orleans, saying that if I would take them back they would pay anything we liked to offer to get them back to New Orleans. Q. Who said that? A. The American consul said that, with the captain of the steamer Rippingham Grange, as it was a great hardship on these men being left, and probably being returned on a tramp steamer going to Saint Lucia. As the captain was a personal friend of mine, I was prevailed upon, very much against my will, to consent to take them back; but I made an express stipulation with him that he should inform these muleteers that we were taking them back as muleteers pure and simple, and that they must bring their beds and fittings with them; that I had nothing on board, and could not obtain them there. He also offered to put some provisions on board, and for me to buy them there; but on my going up from the house with the steward later to see what we had on board, we found we had ample for the voyage back to New Orleans, so I purchased in Durban only things such as fruit and small canned goods, and I had to wait about six hours to get these men on board. They were not allowed to land in Durban. They couldn't go on shore. The immigration officer would not allow them to land. And so we had to take them direct from the Rippingham Grange to our steamer. Now, when I was on board of the tug, Captain Bennett made a request of me that I would give these men employment with my own muleteers on the return passage, which we did to a great extent, as much as we wanted them. Q. Then the American consul and Captain Bennett of the Rippingham Grange had the understanding with you that they were to notify these men that they would return as muleteers? A. Yes, sir; pure and simple."

It is also established by testimony that passage money to the amount of £11—say $55—was paid to the European for the passage of each libelant. The shipping papers with the steamship Rippingham Grange show that the libelants shipped on board the Rippingham Grange for a voyage as muleteers or horsemen from the port of New Orleans to some port in South Africa, with a stipulation that they should have return passage to New Orleans, the port of shipment. On submission the District Court found that the libelants were entitled to recover, giving the following reasons for judgment:

"It is perfectly well settled that the libelants, who are citizens of the United States, subjected themselves to the English law by enlisting on a British vessel. They were to be considered as British subjects for the time of the enlistment. See In re Ross, 140 U. S. 470–472, 11 Sup. Ct. 897, 35 L. Ed. 581; The Marie (D. C.) 49 Fed. 286; The Welhaven (D. C.) 55 Fed. 80. On their way back from South Africa, the libelants were passengers, $55 having been paid to the ship as passage money for each of the libelants. In determining what food, accommodation, and treatment the libelants were entitled to as passengers on their homeward trip, their entire contract should be considered. They were to go from New Orleans to South Africa as hostlers or muleteers, and then they were to be returned to New Orleans. The court is clear that under this contract the libelants had no right to expect better food, accommodation, and treatment on the return voyage than they were entitled to on the outward voyage. But they were entitled, of course, to proper, wholesome, and sufficient food. The court, after carefully considering the voluminous and conflicting evidence in the case, is satisfied that the libelants are entitled to a recovery because of bad and improper food. If the cause of action had arisen on the outward trip, it is clear that the matter would have been governed by the English law, which, in the absence of proof of special damages, allows seamen but one shilling per day for bad food. While this provision of the English law was not operative on the return voyage, when the libelants were passengers, yet that provision, in a case like this, where no special damages have been shown, might well be considered in fixing the amount of the damages. It seems to the court, under all the circumstances of this case, that an allowance to each libelant of $15 is full compensation."

And thereupon rendered a decree for the libelants, 14 in number, awarding each the sum of $15; a total of $210.

From this decree the libelants have appealed, claiming that under the proof they were entitled to the damages originally claimed in the libel.

J. A. Woodville, for appellants.

H. C. Cage and Saml. L. Gilmore, for appellee.

Before PARDEE and SHELBY, Circuit Judges.

PARDEE, Circuit Judge (after stating the facts as above). After a careful examination and full consideration of the evidence, we agree with the learned district judge in holding that the libelants, citizens of the United States, by shipping as horsemen on an English vessel, subjected themselves to the English law, and that for and during the time of the shipment they were to be considered and treated as British subjects. But we are unable to apply this further than for the shipment which was a voyage from the port of New Orleans to South Africa. As we view the case, the voyage ended in South Africa, and the passage home which was contracted for was a part of the compensation. The voyage ended, the libelants were free; and, while they were brought home under contract, they were brought not as enlisted men, shipped seamen, but as passengers. This is a fair construction of the shipping articles, and a proper view to be taken under the circumstances.

We are also of opinion that the libelants on their return home were not only passengers, but were passengers within the meaning of and entitled to the protection of the act of Congress to regulate the carriage of passengers by sea, approved August 2, 1882, 22 Stat. 186 [U. S. Comp. St. 1901, p. 2931], which was enacted for the pur-

pose of protecting emigrant passengers and all passengers other than cabin passengers taken on board at any port or place of a foreign country to be brought to any port or place in the United States.

We agree with the District Court in the finding that under the circumstances and the special arrangements shown to have been made under which the libelants were taken on board the European they were not entitled to complain of the quarters and accommodations furnished, because the evidence clearly shows that the same quarters and accommodations, to all intents and purposes, were furnished the libelants that were furnished the horsemen regularly on board the steamer European; in fact, the evidence shows that the quarters were the best that could have been furnished under the circumstances, and were all that the master agreed to furnish prior to their going on board; and we find that from the actual quarters furnished the libelants on board the European suffered very little, if any, hardship or damage.

The finding of the District Court that bad and improper food was furnished is sustained by the weight of the evidence, so that practically the only question arising on this appeal is whether the libelants recovered sufficient in the lower court to pay the damage or damages resulting from bad and improper food furnished on the voyage. The judge a quo, in fixing these damages, considered that, if the cause of action had arisen on the outward trip, the matter would have been covered by the English law, which, in the absence of special damages, allows seamen one shilling per day for bad food; and he says that, while this provision of the English law was not operative on the return voyage, when the libelants were passengers, yet that such provision in a case like this, where no special damages have been shown, might well be considered in fixing the amount of damages. In other words, in fixing the amount of damages, the learned judge considered the English law in cases somewhat like, but seems to have overlooked, the American law, which we think more particularly bears upon the subject. Section 4 of the passenger act of 1882, 22 Stat. 188 [U. S. Comp. St. 1901, p. 2935], provides with regard to passengers—the category in which we are bound to place the libelants—as follows:

"Sec. 4.—An allowance of good, wholesome and proper food, with a reasonable quantity of fresh provisions, which food shall be equal in value to one and a half navy rations of the United States, and of fresh water, not less than four quarts per day, shall be furnished each of said passengers. Three meals shall be served daily, at regular and stated hours, of which hours sufficient notice shall be given. If any such passengers shall at any time during the voyage be put on short allowance for food and water, the master of the vessel shall pay to each passenger three dollars for each and every day the passenger may have been put on short allowance, except in case of accidents, where the captain is obliged to put the passengers on short allowance."

We have always recognized in this court that in appeals in admiralty we would not disturb the amount of damages allowed by the District Court where it is a matter of discretion, and to increase or diminish would, in effect, be a mere substitution of our judgment; but that where the District Court has proceeded upon a wrong rule, or, in allowing damages, has overlooked some important element

proper to be considered, we are at liberty to review and determine the amount of damages which, under our views of the case, ought to be allowed. The judge a quo, in fixing the amount of damages to be allowed, considered the English law, and thereon seems largely to have based his judgment. He makes no reference to the law of the United States, quoted above, which we think should be considered, if not control, in assessing damages for bad and improper food furnished to passengers who come within the purview of said law. The evidence shows that there was sufficient and proper food on board the ship, and no sufficient reason is given why bad and improper food was served, nor any reason given why the libelants should have been put upon a short allowance. There is evidence strongly tending to show that some of the bad and improper food furnished was disgustingly bad, too bad for any but starving persons to eat; and there is also evidence tending to show that the libelants suffered from starvation, nausea, diarrhœa, weakness, and loss of flesh. In fact, the proof with regard to the quality of food served is such that, if the court is to allow any damage at all therefor, it would seem that it ought to allow up to the statutory provision of our law in cases where passengers are unnecessarily put upon short allowance. While furnishing bad and improper food to a passenger is not technically the same as putting the passenger on a short allowance of food, we think it is substantially equivalent.

As noticed above, the provision for putting a passenger on a short allowance of food under the passenger act of 1882 is $3 per day. We gather from the evidence that the libelants were not furnished bad and improper food on the whole voyage, nor on every day of the whole voyage; that there were days on which it is admitted by all of the libelants that proper and sufficient food of the kind was furnished. While this is the case, as shown from the evidence, we think it is properly inferable from all of it that at least on 15 days of the voyage bad and improper food was furnished. Our conclusion, therefore, is that in assessing the damages in this case the libelants should be allowed $3 per day for 15 days, which makes the sum of $45 to each libelant.

For these reasons the decree of the District Court is amended by increasing the sum to be recovered by the libelants from $15 each to $45 each, from a total of $210 to a total of $630, and, as thus amended, the decree appealed from be affirmed; and it is so ordered. The costs of appeal to be paid by the appellee.